UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MALKA KUMER, CHANA LIBA
KUMER, and MIRIAM ALMACKIES,

                      Plaintiffs,

         -against-

HEZBOLLAH,

                    Defendant.

-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
18-CV-7449 (CBA) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

       Plaintiffs Malka Kumer, Chana Liba Kumer, and Miriam Almackies are American citizens who allege violations of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, against Hezbollah, based on harms they suffered due to rocket and missile attacks on civilians in Israel committed by Hezbollah in 2006. (Am. Compl., ECF No. 21, ¶¶ 1, 6.) The Court previously granted Plaintiffs' motion for partial default judgment as to liability. *Kumer v. Hezbollah*, No. 18-CV-7449 (CBA) (TAM), 2024 WL 4111128 (E.D.N.Y. Aug. 7, 2024), *report and recommendation adopted*, 2024 WL 4107265 (E.D.N.Y. Sept. 6, 2024) (hereinafter "*Kumer I*"). Currently before the Court is Plaintiffs' partial motion for a default judgment as to damages. (Mot. for Default J., ECF No. 43.) For the reasons discussed below, the Court respectfully recommends that Plaintiffs' motion for a partial default judgment be granted, and that Plaintiffs be awarded a total of $21 million in damages.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I. Plaintiffs' Allegations

Plaintiffs initated this case on December 31, 2018, with the filing of a complaint, followed by an amended complaint filed on October 28, 2022. (Compl., ECF No. 1; Am. Compl., ECF No. 21.)

Plaintiffs lived in Safed, Israel, in the summer of 2006. (Am. Compl., ECF No. 21, ¶¶ 26–28.) Plaintiffs allege that from July to August 2006, "Hezbollah fired thousands of rockets and missiles at civilians in northern Israel." (*Id.* ¶ 24.) Plaintiffs describe experiencing "hundreds of terrifying warning sirens followed by rocket strikes and explosions" in or near Safed; "running back and forth between the family home and a bomb shelter"; "being unable to go outside and play [because of the need to] stay[] indoors, at home or in a shelter, for over [a] month"; and "liv[ing] in constant terror of death or serious physical injury." (*Id.* ¶¶ 26–28.) Plaintiffs allege that they were severely traumatized by these events. (*Id.*)

In this motion for a default judgment seeking damages, Plaintiffs allege that they are entitled to a total of $21 million in damages due to emotional pain and suffering they experienced due to these attacks. (*See* Mot. for Default J., ECF No. 43, at 1; *see generally* Mem. in Supp. of Mot. for Default J. ("Mem. in Supp."), ECF No. 44.)

### A. Miriam Almackies

Miriam Almackies seeks damages primarily for emotional distress she suffered as a result of attacks during the summer of 2006 in Safed, Israel, where she lived with her parents, her sister, and her six-week-old baby, while her husband was away completing compulsory service in the Israeli military. (Mem. in Supp., ECF No. 44, at 3; Almackies Decl., ECF No. 47, ¶ 6.) On July 13, 2006, the first day of attacks, her sister, Chaya, "ran into the room in a panic" to tell her there was a war. (Almackies Decl., ECF

No. 47, ¶ 8.) Later, while Chaya was out and while Miriam was nursing her baby, a rocket exploded near their house. (*Id.* ¶ 9.) She was "sure something happened to Chaya," and when she called her mother, her mother did not respond, contributing to her panic. (*Id.*) She had trouble sleeping that night. (*Id.* ¶ 10.) She was not able to be in regular contact with her husband while he was serving in the army. (*Id.* ¶ 11.) At her husband's urging, on about July 14, 2006, she left home with her baby to stay with his family in Jerusalem, where she was "very isolated from [her] support systems." (*Id.* ¶ 12.) As "an 18 year-old girl taking care of a newborn infant in the middle of a war," this isolation was so challenging that she returned to Safed on July 30. (*Id.* ¶¶ 12–13.) There, daily rocket attacks meant frequent sirens, which signaled "an extreme, immediate and terrifying emergency," prompting her to stay downstairs with her baby most of the time. (*Id.* ¶ 13.) On August 9, she left Safed to live with a friend in Tel Aviv, where she stayed "until the war ended." (*Id.* ¶ 14.)

Miriam describes how, during the time in which she lived through the bombardment, she was "extremely scared for [her] baby and was overwhelmed by the feeling that it was [her] duty to protect him, but that [she] was incapable of doing so." [1] (Almackies Decl., ECF No. 47, ¶ 15.) Living through most of the rocket attacks left her "hypervigilant, emotionally vulnerable, and subject to irrational panics and fears, which [she] suffer[s] until today in [her] normal day-to-day life." (Mem. in Supp., ECF No. 44, at 4 (citing Almackies Decl., ECF No. 47, ¶ 17).) Her emotional distress currently manifests in "severe panic attacks" related to the safety of her children. (Almackies

---

[1] Miriam lived in Safed with her infant, parents, and sister between July 13, 2006, and July 14, 2006, and again between July 30, 2006, and August 9, 2006. (*See* Almackies Decl., ECF No. 47, ¶¶ 6, 8, 11, 13, 14.)

Decl., ECF No. 47, ¶¶ 16–18 (describing how, "[f]or example, when a child might be late on the bus from school or late coming from friends, I panic, become irrational, and imagine the worst. I begin calling everyone who could know what happened. . . . I become physically sick, weak and sometimes need to rest in bed for hours or days").) She does not articulate whether her children suffered any physical or emotional harm from the attacks. She still lives in Safed, now with four children, which she refers to as a "war zone" and where she experiences ongoing panic attacks and fear for those children. (*Id*. ¶¶ 14, 18.)

### B. Chana Liba Kumer and Malka Kumer

Chana Liba Kumer and Malka Kumer are sisters who were five and six years old, respectively, at the time of the 2006 attacks in Safed. (Mem. in Supp., ECF No. 44, at 7.) While many of their neighbors left Safed, their family lacked the financial resources to do so, and they remained in the city throughout the attacks. (*Id*.)

Chana was eating lunch with her family when the first rocket fell. (Chana Liba Kumer Decl., ECF No. 45, ¶ 4.) She remembers running down the street with her family, screaming and terrified. (*Id*. ¶ 5.) Most of her friends left the city after the first attack. (*Id*. ¶ 7.) She was not allowed outside often, and listened inside for sirens and rockets. (*Id*. ¶ 8.) Everyone in the family slept in the safest part of the apartment together, and would huddle under the dinner table during rocket attacks that occurred during Shabbat meals. (*Id*.) Her babysitter's apartment was hit with a rocket. (*Id*. ¶ 9.) Packs of "nearly feral" dogs abandoned by families roamed the streets, contributing to the danger associated with going outside and instilling in her a fear of dogs that persists today. (*Id*. ¶ 10.) As a child, she had a hard time understanding why they had to "continue to live" in such a dangerous place. (*Id*. ¶ 11.)

After the attacks stopped, Chana was "jumpy, always expecting another attack, another siren." (*Id.* ¶ 13.) She had nightmares and trouble sleeping. (*Id.* ¶¶ 13–14.) She was unable to sleep alone, and needed someone to wait outside the door when she went to the bathroom. (Mem. in Supp., ECF No. 44, at 10 (citing Chana Liba Kumer Decl., ECF No. 45, ¶¶ 14, 18).) Chana was diagnosed with Post-Traumatic Stress Disorder ("PTSD") and Anxiety Disorder, and underwent three years of therapy. (Chana Liba Kumer Decl., ECF No. 45, ¶ 17.) While she believes therapy helped, she remains unable to go outside alone at night unless she is on the phone with her husband, is afraid of dogs due to her experience with the abandoned dogs that roamed Safed during the 2006 attacks, and still experiences panic attacks. (Mem. in Supp., ECF No. 44, at 10–11.) Because of her anxiety, Chana's "husband has to be available to take [her] calls 24/7." (Chana Liba Kumer Decl., ECF No. 45, ¶ 16.) In recent months, with the increase in attacks on Israel, she has "feelings that [she is] suffocating," worries constantly for the children she teaches, and acknowledges that while "many people are afraid," she has "never seen anyone react as badly as" she does to the rockets.[2] (*Id.* ¶¶ 20–21.) Chana seeks $2 million in damages for emotional pain and suffering. (Mem. in Supp., ECF No. 44, at 12.)

Chana's sister, Malka Kumer, was also deeply traumatized by the attacks. Before the attacks, she "did well in school," "played outside," "often slept over at" friends' houses, and "loved [her] life." (Malka Kumer Decl., ECF No. 46, ¶¶ 3–4.) Once the attacks started, everything changed. (*Id.* ¶ 4.) She describes her experience in the bomb shelter on the first night, which "was packed to the brim, and more people kept coming.

---

[2] Chana's declaration does not indicate where she lives today.

5

Some were crying, some were yelling, some just stared." (*Id*. ¶ 6.) She describes how "[n]o one seemed to know what to do, not even [her] father." (*Id*.) Like Chana, she remembers that friends discussed leaving the city, but her mother said that "wasn't an option" for them. (*Id*. ¶ 7.) They "endured hundreds of warning sirens, followed by rocket attacks," and "[i]t felt like [they] were always in [their] house or in a shelter." (*Id*. ¶ 8.) She tried to play outside with a friend once, but frequent sirens forced them to stay inside. (*Id*. ¶ 9.) She also remembers when her babysitter's apartment was hit by a rocket. (*Id*. ¶ 10.)

After the 2006 attacks, Malka experienced severe mental and emotional harm, and was unable to live "a normal life." (*Id*. ¶ 28; *see id*. ¶¶ 17–19, 21–25, 27.) Malka also experienced anxiety sleeping alone, going to the bathroom alone, spending time away from her family, and undertaking a range of everyday tasks. (*Id*. ¶¶ 11–12.) Her anxiety manifested in stomachaches, other pain, and poor academic performance in childhood, and progressed to formally diagnosed PTSD and persistent substance use disorder. (Mem. in Supp., ECF No. 44, at 9; Malka Kumer Decl., ECF No. 46, ¶ 21.) At one point, she overdosed on Ritalin, was hospitalized, and was ultimately sent to a rehabilitation facility, from which she ran away. (Malka Kumer Decl., ECF No. 46, ¶¶ 30–32.) In addition to suffering from substance use disorder, any stressful situation, including deadlines at school, would provoke "debilitating anxiety and panic attacks." (*Id*. ¶ 15.) Due in part to her substance use disorder and anxiety, she was unable to finish school for years. (*Id.* ¶¶ 25, 36.) A psychologist attributed her behavioral challenges to trauma from the 2006 attacks. (*Id.* ¶ 23.)

Since the attacks, Malka has experienced "consistent bouts of depression," and her "body felt like it was in a constant state of life or death." (*Id*. ¶ 27.) She describes how her "heart raced, [her] breath refused to slow down, [she] could not concentrate,

and [her] stomach was constricted and ached." (*Id.*) She had trouble sleeping, and when she did fall asleep, she had "nightmares of explosions, screaming, and blaring sirens." (*Id.*) Her doctors were unable to tell her "how much longer it would take" to recover or if she "would ever be able to live a normal life again." (*Id.* ¶ 28.) Malka's sister Chana states that Malka experienced "more and more emotional problems as a result of the rockets" over time. (Chana Liba Kumer Decl., ECF No. 45, ¶ 22.)

Malka "feel[s] certain that had it not been for the war," she would have finished school and gone to university. (Malka Kumer Decl., ECF No. 46, ¶ 36.) She "wanted to go to school and perhaps become a psychologist," and "would have been able to have healthy relationships and have better friends who didn't hurt [her]. [She] would have been more independent and would be able to do things on [her] own." (*Id.* ¶ 36.) Her relationships with her family suffered, and there "were years when [she] barely saw them." (*Id.* ¶ 37.) She missed "births of [her] siblings and birthdays." (*Id.*) She says: "I know I have hurt my parents very much and it hurts me to know that." (*Id.*) A psychiatrist who evaluated Malka concluded that "anxiety, low self-esteem and behavioral problems" will "continue to affect her functioning for a long period of time." (Strous Decl., ECF No. 48-3, at ECF p. 19.)

Nevertheless, after significant hard work, in recent years, Malka's emotional state has improved. (*See* Mem. in Supp., ECF No. 44, at 9.) She recently graduated university, with honors, married a supportive husband, and had a daughter. (Malka Kumer Decl., ECF No. 46, ¶¶ 38–40.) However, the attacks since October 7, 2023, have prompted renewed anxiety. (*Id.* ¶¶ 43–44.) She panicked when she heard of the attacks, and she struggles to sleep and to visit her family, who lives closer to the Israel-Lebanon border, where "there is a feeling of actual war." (*Id.* ¶¶ 42–44.) Malka seeks $2.5 million in emotional distress damages. (Mem. in Supp., ECF No. 44, at 9–10.)

## II. Procedural History

As noted above, Plaintiffs initiated this matter on December 31, 2018. (Compl., ECF No. 1.) Following two motions for alternate service, the Court authorized Plaintiffs to effectuate service by serving three Hezbollah-affiliated entities. (*See* First Mot. for Service, ECF No. 6; Second Mot. for Service, ECF No. 24; Mem. & Order, ECF No. 25.) Plaintiffs filed proof of service on July 25, 2023, indicating that service was effected on July 25, 2023, rendering Defendant's answer due August 15, 2023. (Aff. of Service, ECF No. 26.)

At Plaintiffs' request, the Clerk of Court entered a certificate of default on October 27, 2023. (Req. for Certificate of Default, ECF No. 28; Certificate of Default, ECF No. 30.) On December 12, 2023, the Court granted Plaintiffs' request for a two-step motion for a default judgment. (Dec. 12, 2023 ECF Order; Pls.' Status Rep., ECF No. 29.) On February 28, 2024, Plaintiffs filed their motion for a partial default judgment as to liability, which the Honorable Carol Bagley Amon referred to the undersigned Magistrate Judge for a report and recommendation. (Notice of Mot., ECF No. 32; Mar. 1, 2024 ECF Order.) On August 7, 2024, after Plaintiffs submitted court-ordered supplemental briefing, the undersigned Magistrate Judge recommended granting Plaintiffs' motion for default judgment as to liability, and on September 6, 2024, Judge Amon adopted that Report and Recommendation. (July 25, 2024 ECF Order; Suppl. Br., ECF No. 36.) *Kumer I*, 2024 WL 4111128.

On December 16, 2024, Plaintiffs filed their partial motion for default judgment seeking damages. (Mot. for Default J., ECF No. 43; Mem. in Supp., ECF No. 44; Chana Liba Kumer Decl., ECF No. 45; Malka Kumer Decl., ECF No. 46; Almackies Decl., ECF No. 47; Tolchin Decl., ECF No. 48.) On January 9, 2025, Judge Amon referred the motion to the undersigned Magistrate Judge. (Jan. 9, 2025 ECF Order Referring Mot.) For the

reasons discussed below, the Court respectfully recommends that Plaintiffs' motion for a partial default judgment be granted and that Plaintiffs be awarded $21 million total in damages.

## DISCUSSION

### I. Default

As noted above, Defendant's liability has already been established. *See Kumer I*, 2024 WL 4111128. "While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *see also Kaplan v. Hezbollah*, No. 19-CV-3187 (BMC) (ST), 2022 WL 17772031, at *3 (E.D.N.Y. Sept. 16, 2022) (hereinafter "*Kaplan II*"), *report and recommendation adopted*, Oct. 3, 2022 ECF Order Adopting R. & R. The Court must have adequate means to assess damages, which the court may draw from an inquest, sworn declarations, or other evidence. *See Kaplan II*, 2022 WL 17772031, at *3 (citing *Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989)); *see also* Fed. R. Civ. P. 55(b)(2) ("The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to: . . . determine the amount of damages."); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1337 (D. Utah 2006) (relying exclusively on affidavit testimony to award pain and suffering damages under the ATA).

Here, Plaintiffs seek a partial default judgment holding Defendant liable for $21 million in damages under the ATA to compensate Plaintiffs for their injuries. (Mot. for Default J., ECF No. 43; Mem. in Supp., ECF No. 44, at 12.) In support of that motion, all three Plaintiffs submitted declarations. (*See* Almackies Decl., ECF No. 47; Chana Liba Kumer Decl., ECF No. 45; Malka Kumer Decl., ECF No. 46.) For the following reasons,

the Court respectfully recommends granting Plaintiffs' motion and awarding Plaintiffs $21 million in damages.

## II. Compensatory Damages

### A. Legal Standard

Under the ATA, "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs" who establishes liability "shall recover threefold the damages he or she sustains and the cost of the suit." 18 U.S.C. § 2333(a). While the statute does not specify the type of damages at issue, courts in this district and others have held that the damages from § 2333(a) are compensatory. *Stansell v. Revolutionary Armed Forces of Colombia (FARC)*, No. 16-MC-405 (LGS) (SN), 2022 WL 2530359, at *13–20 (S.D.N.Y. Mar. 29, 2022) (analyzing cases), *report and recommendation adopted*, 2022 WL 17830551 (S.D.N.Y. Dec. 21, 2022).

#### 1. *Emotional Distress Damages*

Emotional pain and suffering is compensable under the ATA. *Raanan v. Binance Holdings Ltd.*, No. 24-CV-697 (JGK), 2025 WL 605594, at *9 (S.D.N.Y. Feb. 25, 2025); *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 589 (E.D.N.Y. 2005); *Ests. of Ungar & Ungar ex rel. Strachman v. Palestinian Auth.*, 325 F. Supp. 2d 15, 66 (D.R.I. 2004).[3] Damages for emotional harm resulting from terrorism "are by their very nature unquantifiable." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015). In light of this uncertainty, the "deterrent purpose of the ATA is maximized if it is interpreted to

---

[3] Allegations of an injury to "'her person,' 'mental anguish, emotional pain and suffering, and loss of society' are cognizable injuries 'under the plain language, as well as a common-sense interpretation, of the ATA.'" *Raanan*, 2025 WL 605594, at *9 (quoting *Biton v. Palestinian Interim Self-Gov't Auth.*, 310 F. Supp. 2d 172, 182 (D.D.C. 2004)).

subject terrorists to the broadest range of economic damages." *Knox v. Palestine Liberation Org.*, 442 F. Supp. 2d 62, 77 (S.D.N.Y. 2006) (citing *Ests. of Ungar*, 304 F. Supp. 2d at 267), *motion for relief from judgment granted*, 248 F.R.D. 420 (S.D.N.Y. 2008).[4]

To assess emotional distress damages for survivors of terrorist attacks, courts typically consider damages awarded in similar cases. *See Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008); *see also Jeanty v. City of New York*, No. 18-CV-5920 (KPF), 2021 WL 276553, at *7 (S.D.N.Y. Jan. 27, 2021) (noting, outside the context of terror attacks, that when "determining whether and to what extent Plaintiff is entitled to emotional distress damages, the Court considers, among other factors, amounts awarded in similar cases"); *see, e.g., Moradi*, 77 F. Supp. 3d at 70; *Swinney v. Islamic Republic of Iran*, No. 20-CV-2316 (ACR), 2025 WL 1547694, at *32 (D.D.C. May 30, 2025).

Courts have typically awarded $1.5 million to survivors of terror attacks who "suffered psychological harm" without physical injury. *See, e.g., Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 49 (D.D.C. 2012), *vacated on other grounds*, No. 10-CV-1689 (RCL), 2019 WL 8060796 (D.D.C. Sept. 11, 2019); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010); *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 16 (D.D.C. 2012) (awarding servicemember $1.5 in compensatory damages for his emotional injury resulting from terror attack). In a related case stemming from the same 2006 attacks in Safed, the majority of the victims who suffered emotional distress were awarded $1.5 million in emotional distress damages. *See Kaplan II*, 2022 WL 17772031, at

---

[4] Traditional tort law can also help guide courts' assessment of damages. *Lelchook v. Commerzbank AG*, No. 10-CV-5795 (AKH), 2011 WL 4087448, at *2 (S.D.N.Y. Aug. 2, 2011).

*5.[5] However, higher damages were awarded to certain *Kaplan II* plaintiffs. For example, Malka and Chana Liba's father, Chayim Kumer, experienced severe emotional distress during and after the same 2006 attacks, including physical manifestations of stress requiring hospitalization and ongoing PTSD and anxiety. *See* Special Master's Report on Claims of Chayim and Nechama Kumer at 5–9, *Kaplan I*, No. 09-CV-646, ECF No. 72 (D.D.C. Apr. 2, 2016) (describing physical manifestations of emotional distress and diagnoses); *id*. at 15 (explaining how these severe symptoms warranted $2 million, rather than $1.5 million, in emotional distress damages). Based on the Special Master's recommendation, the *Kaplan II* court awarded Chayim Kumer $2 million in compensatory damages for emotional distress. *See Kaplan II*, 2022 WL 17772031, at *5.[6]

2. *Solatium Damages*

Separately from an individual plaintiff's emotional distress, solatium damages are meant to compensate victims for the "mental anguish, bereavement, and grief that those with a close relationship" to someone who has been killed or injured experiences "as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-CV-9848 (GBD) (FM), 2012 WL 3090979, at *4 (S.D.N.Y. July 30, 2012) (quotation marks omitted), *report*

---

[5] *Kaplan* is another case brought by many of the same plaintiffs who originally brought this case against the same defendant. *Kumer v. Hezbollah*, No. 18-CV-7449 (CBA) (RLM), 2020 WL 13572820, at *1 n.1 (E.D.N.Y. Feb. 12, 2020). *Kaplan* was initially filed in the United States District Court for the District of Columbia (Docket No. 09-CV-646) and was then transferred to the Eastern District of New York (Docket No. 19-CV-3187) in May 2019. *See Kaplan v. Hezbollah*, No. 09-CV-646 (RCL) (D.D.C.), May 14, 2019 ECF Orders, ECF Nos. 97, 98.

[6] The Court notes that, when comparing compensatory damage awards for emotional distress, courts may take inflation and the present value of the injury into account. *DiSorbo v. Hoy*, 343 F.3d 172, 185 (2d Cir. 2003) ("[W]hen considering the sizes of the awards in earlier cases, we must take into account inflation."); *Mayo-Coleman v. Am. Sugar Holdings, Inc.*, No. 14-CV-79 (PAC), 2018 WL 2684100, at *5 (S.D.N.Y. June 5, 2018).

*and recommendation adopted*, 2012 WL 4711407 (S.D.N.Y. Oct. 3, 2012); *see also Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 90 (D.D.C. 2002).

"In general, there is a presumption that immediate family members suffer grief and emotional injury as a result of a terrorist attack on another family member." *Swinney*, 2025 WL 1547694, at *33 (citing *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 38 (D.D.C. 2016) (hereinafter "*Kaplan I*")). Solatium damages are generally appropriate when a claimant's loved one was killed or physically or emotionally injured. *Cf. Moradi*, 77 F. Supp. 3d at 72; *Anderson v. Islamic Republic of Iran*, 839 F. Supp. 2d 263, 266 (D.D.C. 2012). Solatium damages may also be awarded as compensation for a victim's fear for the well-being of loved ones subjected to terror attacks. *See, e.g.*, *Kaplan II*, 2022 WL 17772031, at *4–5. The decision whether to award solatium damages, and when to depart from prior precedent as to the amount of solatium damages awarded, lies with the district court absent abuse of discretion. *Fraenkel v. Islamic Republic of Iran, et al.*, 892 F.3d 348, 362 (D.C. Cir. 2018).

In the context of terrorism cases, "[t]he common framework for solatium damages was established in *Heiser v. Islamic Republic of Iran*," which provides for specific monetary awards for family members of direct victims of terrorism. *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 139 (D.D.C. 2019) (citing *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), and *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012)). Under that framework, when fashioning a solatium damages award due to physical injury suffered by a child, "[p]arents of victims who survived terrorist attacks are typically awarded $2.5 million in solatium damages." *Lee v. Islamic Republic of Iran*, No. 19-CV-830 (APM), 2022 WL 20444119, at *13 (D.D.C. Apr. 11, 2022), *report and recommendation adopted*, 2023 WL 4891534 (D.D.C. June 29, 2023).

When awarding solatium damages for family members who have experienced emotional distress, however, "relatives of surviving victims presenting with emotional trauma and no physical injury receive amounts proportionally less than those with physical injuries, namely, $1 million for spouses; $850,000 for parents; $750,000 for children, and $500,000 for siblings." *Kaplan I*, 213 F. Supp. 3d at 38. In addition, when evaluating solatium damages for individuals who experienced the relevant terrorist attacks directly, courts must be careful not to duplicate emotional distress damages. *Id.* at 39. Failure to establish a close relationship with the relevant decedent or harmed party can preclude recovery of solatium damages. *See, e.g.*, *Knox*, 442 F. Supp. 2d at 77 n.8.[7] Courts typically do not award family members seeking solatium damages more than the surviving direct victim's assault, battery, and intentional infliction of emotional distress damages. (*See* Special Master's Report, ECF No. 48-2, at 16 (acknowledging that "it is 'inappropriate for the solatium awards of family members to exceed the pain and suffering awards of the surviving servicemen'") (quoting *Fain III v. Islamic Republic of Iran*, 885 F. Supp. 2d 78, 82 (D.D.C. 2012)).)

In a prior case assessing damages for survivors of the 2006 bombings of Safed, the *Kaplan II* court awarded Miriam's mother, Dvora, $850,000 in solatium damages, and awarded her sister, Chaya, $750,000 in solatium damages. *Kaplan II*, 2022 WL 17772031, at *5. This assessment was primarily based on each survivor's fear regarding the safety of their family members. (*See* Special Master's Report, ECF No. 48-2, at 14–16.)

---

[7] That requirement is easily met here, where Miriam seeks solatium damages for fear of harm to her son. (*See, e.g.*, Almackies Decl., ECF No. 47, ¶ 15.)

**B. Analysis**

This Court previously found that Plaintiffs "adequately alleged that they have experienced severe emotional distress and trauma as a result of Defendant Hezbollah's conduct." *Kumer I*, 2024 WL 4111128, at *6. The Court also found that "'defendant's conduct was a proximate cause of plaintiff's harm, i.e. the conduct was a substantial factor in the sequence of responsible causation and whose injury was reasonably foreseeable or anticipated as a natural consequence.'" *Id.* (quoting *Miller v. Arab Bank, PLC*, 372 F. Supp. 3d 33, 46 (E.D.N.Y. 2019)). Accordingly, the Court now recommends awarding damages for Plaintiffs' injuries.

1. *Miriam Almackies*

As discussed above, Miriam Almackies seeks $1.5 million in compensatory damages for pain and suffering and $1 million in solatium damages based on her fear for her loved ones as a result of the 2006 attacks. In support of these requests, she discusses experiencing near-constant terror during the attacks, which "left [her] hypervigilant, emotionally vulnerable, and subject to irrational panics and fears" that impact her life to this day. (*See* Almackies Decl., ECF No. 47, ¶¶ 10, 13–18.)

In the prior related case, Miriam's mother and sister, who suffered similar harm, were each awarded $1.5 million in emotional pain and suffering damages based on a Special Master's recommendation. *See Kaplan II*, 2022 WL 17772031, at *4–5. (*See* Special Master's Report, ECF No. 48-2, at 14–16.) The Court also notes that $1.5 million is a commonly awarded amount for victims who survived terror attacks but who experienced emotional harm. *See Harrison*, 882 F. Supp. 2d at 49; *Kaplan II*, 2022 WL 17772031, at *5. The Court finds that Miriam's experience supports an award consistent with this precedent. Accordingly, the Court recommends awarding Miriam $1.5 million

in emotional distress damages for the harm she experienced as a result of the 2006 attacks on Safed.[8]

In terms of solatium damages, the record indicates that Miriam experienced significant emotional distress based on her fear for her baby's safety. (Almackies Decl., ECF No. 47, ¶¶ 13, 15.) Miriam was "extremely scared for [her] baby" and very distressed by her inability to protect him. (*Id.* ¶ 15.) She describes constant fear that her infant son would be hurt, and being "overwhelmed by the feeling that it was [her] duty to protect him, but that [she] was incapable of doing so." (*Id.*) Today, when her children are out later than expected, she panics, becomes "irrational" and physically ill, reaches out to everyone who might be able to tell her what happened to her children, and often takes days to recover. (*Id.* ¶¶ 16–18.)

As noted above, Miriam's mother and sister were awarded $850,000 and $750,000, respectively, in solatium damages based on their fears for each others' lives during the same period, within the same household. *Kaplan II*, 2022 WL 17772031, at *4–5; *Kaplan I*, 213 F. Supp. 3d 27. (Special Master's Report, ECF No. 48-2, at 14–16.)[9] These

---

[8] As noted above, courts may adjust for inflation when comparing damages awards from previous analogous cases. Here, given the relatively short duration of Miriam Almackies's time in Safed in 2006 during the attacks, the Court finds that her requested damages, which amount to the typical compensatory damages award for victims of terrorism who have experienced emotional distress, are supported without a need to evaluate inflation.

[9] The relevant analysis from the Special Master's Report reads in full:

> The testimony given by Dvora amply reveals the emotional anguish she experienced as a result of trauma experienced by her daughter, Chaya. She recounts how "very frightened" she was when a rocket landed near to Chaya when she was outside; how

awards are consistent with prior awards for parents and children whose loved ones survived terror attacks. *See Kaplan I*, 213 F. Supp. 3d at 38. While Miriam is "loathe to compare her harm to that of anyone else (least of all her family members)," she notes that her "fears for the life of her six-week-old infant — at a time when she herself was only eighteen-years-old and her husband was away in the army — were of a different type and magnitude than those experienced by her mother and sister," whose fears were rooted in worry for the safety of their adult family members. (Mem. in Supp., ECF No. 44, at 6.)

As noted above, the most common award for this type of solatium damages for a parent, based on fear for a child's life, would be $850,000. *See Kaplan II*, 2022 WL 17772031, at *4–5; *Kaplan I*, 213 F. Supp. 3d 27. (Special Master's Report, ECF No. 48-2, at 14–16.) Here, the Court finds that Miriam has credibly demonstrated emotional trauma that was particularly severe as a new mother raising a six week old child on her own

---

distressed she was that Chaya became "a different person" after the "incident"; and how Chaya's "fear, stress and insecurity" weighed heavily on her.

Chaya's testimony reveals that she feared for her "elderly parents" and was concerned about [the] "stressful, anxious environment" in which they were living. Chaya relates her distress finding her mother "hysterically crying" upon her return following the rocket attack. She recounts how during her time away from Tzfat, she feared that "something had happened to them" and, despite their reassurances to the contrary, was concerned all was not well.

(Special Master's Report, ECF No. 48-2, at 16.)

while her husband was away serving in the military. Accordingly, the Court recommends awarding Miriam $1 million in solatium damages.[10]

### 2. *Chana Liba Kumer*

Chana Liba Kumer seeks $2 million in emotional pain and suffering damages based on the harm she experienced as a result of the 2006 attacks. (Mem. in Supp., ECF No. 44, at 10, 12.) As discussed above, in addition to experiencing acute fear throughout the attacks, Chana was diagnosed with PTSD and anxiety, and still struggles with anxiety that is disproportionate to those around her and that impacts her daily functioning. (*See, e.g.*, Chana Liba Kumer Decl., ECF No. 45, ¶¶ 17, 20, 21.) She is too afraid to go outside at night, is terrified of dogs, experiences panic attacks, and needs her husband to be available to take her calls at all times. (Mem. in Supp., ECF No. 44, at 10–11; Chana Liba Kumer Decl., ECF No. 45, ¶ 16.) In the midst of recent attacks in Israel, she "know[s] that many people are afraid," but she has "never seen anyone react as badly as" she does to the rocket and missile attacks. (Chana Liba Kumer Decl., ECF No. 45, ¶ 20.) She doesn't "know if [she] will ever feel completely safe again." (*Id.* ¶ 24.)

Chana's emotional distress is similar to the distress her father Chayim articulated in *Kaplan I*. There, the Special Master noted that Chayim was unable to tolerate being in certain spaces because of his trauma, that his anxiety produced physical symptoms,

---

[10] As to the solatium damages award for Miriam Almackies, not only has she established that her fear for her child was particularly severe, the Court notes that inflation also supports an increase in the typical solatium damages award for a parent. *See generally* CPI Inflation Calculator, U.S. Bureau of Labor Statistics, *available at* https://www.bls.gov/data/inflation_calculator.htm (suggesting that an award of $850,000 in September 2016, when the *Kaplan I* court evaluated the appropriate damages awards for many survivors of the Safed attacks, would be worth over $1 million today). *See generally Kaplan I*, 213 F. Supp. 3d at 38; *Kaplan II*, 2022 WL 1772031, at *5 (awarding damages in the context of default).

including "gallbladder problems which resulted in three separate hospitalizations," that he regularly experiences panic related to the attacks, and that he was diagnosed with PTSD and anxiety that remained ongoing at the time of the report. Special Master's Report on Claims of Chayim and Nechama Kumer at 15, *Kaplan I*, No. 09-CV-646, ECF No. 72 (D.D.C. Apr. 2, 2016). The *Kaplan II* court held that $2 million in damages would be necessary to properly compensate him for his emotional distress. *Kaplan II*, 2022 WL 17772031, at *5.

The Court finds that Chana Liba Kumer has demonstrated severe, ongoing emotional distress, physical manifestiations of that emotional distress, and ongoing panic, PTSD, and anxiety that impact her daily life. The Court also finds that previous $1.5 million damage awards for emotional distress resulting from the same rocket attacks, awarded today, would be worth around $2 million.[11] Taking these circumstances into consideration, the Court recommends awarding Chana Liba Kumer $2 million in compensatory damages for the emotional pain and suffering she experienced due to the 2006 attacks on Safed.

3. *Malka Kumer*

Malka Kumer seeks $2.5 million in emotional pain and suffering damages. (Mem. in Supp., ECF No. 44, at 9–10.) As discussed at length above, Malka's uncontested declaration and expert psychological evaluations indicate that the 2006 attacks caused her serious, largely irreversible emotional trauma. The attacks disrupted her ability to

---

[11] *See generally* CPI Inflation Calculator, U.S. Bureau of Labor Statistics, *available at* https://www.bls.gov/data/inflation_calculator.htm (suggesting that an award of $1,500,000 in September 2016, when the *Kaplan I* court evaluated the appropriate damages awards for many survivors of the Safed attacks, would be worth almost $2 million today). *See generally Kaplan I*, 213 F. Supp. 3d at 36; *Kaplan II*, 2022 WL 1772031, at *5.

stay in school, to interact with her family and with loved ones, and to maintain and form healthy relationships. She struggled with substance use disorder, hospitalization, and dysfunction for over a decade, which her psychologist attributed to the attacks. (Mem. in Supp., ECF No. 44, at 9; Malka Kumer Decl., ECF No. 46, ¶¶ 13, 21, 22–23, 25, 30–33.)

To contextualize the requested damages award for Malka's emotional distress, the Court considers her father's experience. As discussed above, Chayim Kumer's emotional distress stemming from the 2006 attacks also resulted in a PTSD diagnosis, physical symptoms, and short term hospitalization. *See* Special Master's Report on Claims of Chayim and Nechama Kumer at 5–9, *Kaplan I*, No. 09-CV-646, ECF No. 72 (D.D.C. Apr. 2, 2016). The Special Master's report does not indicate that Chayim struggled with substance use disorder, interruption to his education, self-destructive behavior, or persistent, severe challenges forming and maintaining healthy relationships due to the 2006 attacks. *See id*.

The Court finds that Malka has demonstrated remarkably severe emotional harm stemming from the attacks beyond even that which her father articulated, including physical symptoms, behavioral health challenges, educational struggles, serious relationship dysfunction and more, and that this emotional distress has permeated nearly every aspect of her life since 2006. In recognition of the severe harm she has suffered and will continue to suffer, and the present value of damage awards for similar harm, the Court recommends awarding Malka Kumer $2.5 million in damages for emotional distress.

4. *Treble Damages*

Under the ATA, Plaintiffs are entitled to treble damages. 18 U.S.C. § 2333(a). Accordingly, the Court recommends awarding Plaintiff Miriam Almackies $7.5 million,

Plaintiff Chana Liba Kumer $6 million, and Plaintiff Malka Kumer $7.5 million, for a total of $21 million.

## CONCLUSION

For the foregoing reasons, the Court recommends granting Plaintiffs' motion for a default judgment as to damages. The Court further recommends entry of a final judgment, awarding Plaintiffs a total of $21 million for Defendant's violations of the ATA.

\* \* \* \* \*

This report and recommendation will be filed electronically. The Court also respectfully directs Plaintiffs to provide a copy of this report and recommendation to Defendant forthwith and to file proof of same by **July 25, 2025.** Mailing shall be effected via international courier delivery to Al Manar television, Al Nour radio, and the Lebanese Media Group. Objections to this report and recommendation must be filed, with a courtesy copy sent to the Honorable Carol Bagley Amon at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen (14) days of filing. Failure to file objections within the specified time waives the right to appeal both before the district court and appellate courts. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See, e.g.*, *Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to

object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate[ judge's] decision" (quotation marks omitted)).

**SO ORDERED.**

Dated: Brooklyn, New York
July 18, 2025

_Taryn A. Merkl_
TARYN A. MERKL
UNITED STATES MAGISTRATE JUDGE